1  **Ursula Schanne**, *pro se*
2  **Gerard H Moore**, *pro se*
3  16503 Reichel Rd SE
4  Rainier, Washington 98576
5  (360) 446-2121
6  xercies@aol.com
7

FILED _____ LODGED
_____ RECEIVED

OCT 1 4 2010

BY _____ CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
DEPUTY

8              UNITED STATES DISTRICT COURT FOR THE

9            WESTERN DISTRICT OF WASHINGTON STATE

10  **Ursula Schanne**, *pro se*           Case # **CV10-5753 BHS**
    **Gerard H Moore**, *pro se*

    Plaintiff,

                                           **ORIGINAL PETITION**

        vs.

    **Nationstar Mortgage LLC**            Date: October 14th 2010

    Defendant

11

12  Comes now  Ursula Schanne  Gerard H Moore , hereinafter referred to as "Petitioner," and

13  moves the court for relief as herein requested:

14                              **PARTIES**

15  Petitioner is  Ursula Schanne  Gerard H Moore , 16503 Reichel Rd SE   Rainer  WA 98576.

16  Currently Known Defendant(s) are/is:  Nationstar Mortgage LLC ,  350 Highland Dr  ,  TX

17  75067, by and through its attorney .

18                          **STATEMENT OF CAUSE**

19  Petitioner, entered into a consumer contract for the refinance of a primary residence located at

20  16503 Reichel Rd SE   Rainer  WA 98576, hereinafter referred to as the "property."

21  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

22  predatory loan agreement with Defendant.

23  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully

24  crafted scheme intended to defraud Petitioner.

ORIGINAL PETITION                    1 of 25

**10-CV-05753-CMP**

25   Defendants failed to make proper notices to Petitioner that would have given Petitioner warning
26   of the types of tactics used by Defendants to defraud Petitioner.

27   Defendants charged false fees to Petitioner at settlement.

28   Defendants used the above referenced false fees to compensate agents of Petitioner in order to
29   induce said agents to breach their fiduciary duty to Petitioner.

30   Defendant's attorney caused to be initiated collection procedures, knowing said collection
31   procedures in the instant action were frivolous as lender is estopped from collection procedures,
32   under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
33   the production of the original promissory note alleged to create a debt.

34                                              **IN BRIEF**
35                              *(Non-factual Statement of Posture and Position)*

36    It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be
37   making a number of allegations that, outside the context of the current condition of the real
38   estate industry, may seem somewhat outrageous and counter-intuitive.

39   When Petitioner accuses ordinary individuals of acting in concert and collusion with an
40   ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
41   unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
42   people, just doing what they have been trained to do, are out to swindle the poor
43   unsuspecting borrower.

44   The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
45   committed by people acting in concert and collusion, one with the other.  Petitioner has no
46   reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
47   that what they were doing was part of an ongoing criminal conspiracy, only that it was,
48   and they, at the very least, kept themselves negligently uninformed of the wrongs they
49   were perpetrating.  Petitioner maintains the real culprit is the system itself, including the
50   courts, for failure to strictly enforce the consumer protection laws.

51                          **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
52                                  *(General State of the Real Estate Industry)*

53    **THE BEST OF INTENTIONS**

54    Prior to the 1980's and 1990's ample government protections were in place to protect

55    consumers and the lending industry from precisely the disaster we now experience.

56    During President Clinton's administration, under the guise of making housing available to

57    the poor, primary protections were relaxed which had the effect of releasing the

58    unscrupulous on the unwary.

59    Prior to deregulation in the 1980's, lenders created loans for which they held and assumed

60    the risk.  Consequently, Americans were engaged in safe and stable home mortgages.

61    With the protections removed, the unscrupulous lenders swooped in and, instead of

62    making loans available to the poor, used the opportunity to convince the unsophisticated

63    American public to do something that had been traditionally taboo; home buyers were

64    convinced to speculate with their homes, their most important investment.

65    Nationstar Mortgage LLC , Ameriquest, Countrywide, and many others swooped in and

66    convinced Americans to sell their homes, get out of their safe mortgage agreements, and

67    speculate with the equity they had gained by purchasing homes they could not afford.

68    Lenders created loans intended to fail as, under the newly crafted system, the Lender

69    profited more from a mortgage default than from a stable loan.

70    Companies cropped up who called themselves banks when, in fact, they were only either

71    subsidiaries of banks, or unaffiliated companies that were operated for the purpose of

72    creating and selling promissory notes.  As will be demonstrated, these companies then

73    profited from the failure of the underlying loans.

74    **HOW IT WORKS**

75    Briefly, how it works is this, the Lender would secure a large loan from a large bank,

76    convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an

77    investor.

78    People would set up mortgage companies by securing a large loan from one of the major

79    banks, then convert that loan into 20 and 30 year mortgages.  In order to accomplish this

80    an Agent would contract with a seller to find a buyer, bring both seller and buyer to a

81    lender who would secure the title from the seller using the borrowed bank funds for that

82    purpose, and then trade the title to the buyer in exchange for a promissory note.

83    The lender then creates a 20 or 30 year mortgage with money the lender must repay within
84    6 months.  As soon as the closing is consummated, the promissory note is sold to an
85    investor pool.

86    Using the instant case as an example, a 322,050.00 note at 7.2730% interest over 30 years
87    will produce $281,977.22  The lender can then offer to the investor the security instrument
88    (promissory note) at say 50% of it's future value.  The investor will, over the life of the
89    note, less approximately 3.00% servicing fees, realize $389,473.35 .  The lender can then
90    pay back the bank and retain a handsome profit in the amount of $91,514.48.  The lender,
91    however, is not done with the deal.

92    The lender signed over the promissory note to the investor at the time of the trade, but did
93    not sign over the lien document (mortgage or deed of trust).  The State of Kansas Supreme
94    Court addressed this issue and stated that such a transaction was certainly legal.  However,
95    it created a fatal flaw as the holder of the lien document, at time of sale of the security
96    instrument, received consideration in excess of the lien amount.  Since the lien holder
97    received consideration, he could not be harmed.    Therefore  the  lien  became  an
98    unenforceable document.

99    This begs the question: if keeping the lien would render it void, why would the lender not
100   simply transfer the lien with the promissory note?  The reason is because the lender will
101   hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full
102   amount of the lien as abandoned funds, and deduct the full amount from the lender's tax
103   liability.  The lender, by this maneuver, gets consideration a second time.  And still the
104   lender is not done profiting from the deal.

105   After sale of the promissory note, the lender remains as the servicer for the investor.  The
106   lender will receive 3% of each payment the lender collects and renders to the investor
107   pool.  However, if the payment is late, the lender is allowed to assess an extra 5% and keep
108   that amount.  Also, if the loan defaults, the lender stands to gain thousands for handling the
109   foreclosure.

110   The lender stands to profit more from a note that is overly expensive, than from a good
111   stable loan.   And where, you may ask, does all this profit come from?  It comes from the
112   equity the borrower had built up in the home.  And still the lender is not finished profiting
113   from the deal.

114   Another nail was driven in the American financial coffin when on the last day Congress
115   was in session in 2000 when restrictions that had been in place since the economic
116   collapse of 1907 were removed.  Until 1907  investors were allowed to bet on stocks
117   without actually buying them.  This unbridled speculation led directly to an economic
118   collapse. As a result the legislature banned the practice, until the year 2000.  In 2000 the
119   unscrupulous lenders got their way on the last day of the congressional session.  Congress
120   removed the restriction banning derivatives and again allowed the practice, this time
121   taking only 8 years to crash the stock market.  This practice allowed the lender to profit
122   further from the loan by betting on the failure of the security instrument he had just sold to
123   the unwary investor, thus furthering the purpose of the lender to profit from both the
124   borrower (consumer) and the investor.

125   The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
126   bailout at the expense of the taxpayer.  The unsuspecting consumer was lulled into
127   accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
128   were acting under the guise of government regulation and, therefore, the borrower had
129   reason to expect good and fair dealings from all. Unfortunately, the regulations in place to
130   protect the consumer from just this kind of abuse were simply being ignored.

131   The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
132   the referral of the client to the lender by a person acting as an agent for the borrower.
133   Hereinafter, the person or entity who receives any portion of the yield spread premium, or
134   a commission of any kind consequent to securing the loan agreement through from the
135   borrower will be referred to as "Agent."  The fee, authorized by the consumer protection
136   law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
137   seeking out a lender for the borrower, would seek the best deal for his client rather than
138   who would pay him the most.  That was the intent, but not the reality.  The reality is that
139   Agents never come away from the table with less than 2% or 3% of the principal.  This is
140   accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
141   fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
142   product than the borrower qualifies for.  This will generate more profits for the lender and,
143   consequently, for the Agent.

144   It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
145   the fair market price.  This allows the lender to increase the cost of the loan product and
146   give the impression that the borrower is justified in making the purchase.

ORIGINAL PETITION                                              5 of 25

147     The lender then charges the borrower an underwriting fee in order to convince the
148     borrower that someone with knowledge has gone over the conditions of the note and
149     certified that they meet all legal criteria. The trustee, at closing, participates actively in the
150     deception of the borrower by placing undue stress on the borrower to sign the large stack
151     of paperwork without reading it. The trustee is, after all, to be trusted and has been paid to
152     insure the transaction. This trust is systematically violated for the purpose of taking unfair
153     advantage of the borrower.   The entire loan process is a carefully crafted contrive
154     connivance designed and intended to induce the unsophisticated borrower into accepting a
155     loan product that is beyond the borrowers means to repay.  With all this, it should be a
156     surprise to no one that this country is having a real estate crisis.

157                          **PETITIONER WILL PROVE THE FOLLOWING**
158     Petitioner is prepared to prove, by a preponderance of evidence that:

159        •  Lender has no legal standing to bring collection or foreclosure claims against the
160           property;

161        •  Lender is not a real party in interest in any contract which can claim a collateral
162           interest in the property;

163        •  even if Lender were to prove up a contract to which Lender had standing to enforce
164           against Petitioner, no valid lien exists which would give Lender a claim against the
165           property;

166        •  even if Lender were to prove up a contract to which Lender had standing to enforce
167           against Petitioner,  said contract was fraudulent in its creation as endorsement was
168           secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
169           the inducement, fraud in the execution, usury, and breaches of contractual and
170           fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
171           Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
172           Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
173           "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
174           'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
175           bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
176           pooled together in a trust fund;

177    • Defendants have concocted a carefully crafted connivance wherein Lender
178       conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
179       by inducing Plaintiff to enter into a predatory loan inflated loan product;

180    • Lender received unjust enrichment in the amount of 5% of each payment made late
181       to Lender while Lender and Lender's assigns acted as servicer of the note;

182    • Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
183       handling the foreclosure process on a contract Lender designed to have a high
184       probability of default;

185    • Lender intended to defraud Investor by converting the promissory note into a
186       security instrument and selling same to Investor;

187    • Lender intended to defraud Investor and the taxpayers of the United States by
188       withholding the lien document from the sale of the promissory note in order that
189       Lender could then hold the lien for three years, then prepare and file Internal
190       Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
191       and deduct same from Lender's income tax obligation;

192    • Lender defrauded backers of derivatives by betting on the failure of the promissory
193       note the lender designed to default;

194    • participant Defendants, et al, in the securitization scheme described herein have
195       devised business plans to reap millions of dollars in profits at the expense of
196       Petitioner and others similarly situated.

197                              **PETITIONER SEEKS REMEDY**

198    In addition to seeking compensatory, consequential and other damages, Petitioner seeks
199    declaratory relief as to what (if any) party, entity or individual or group thereof is the
200    owner of the promissory note executed at the time of the loan closing, and whether the
201    Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
202    Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
203    alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

204    ***PETITIONER HAS BEEN HARMED***

205    Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

206   Such harm and detriment includes economic and non-economic damages, and injuries to
207   Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

208   In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
209   equitable relief requested herein is granted.

210                               **STATEMENT OF CLAIM**

211   *DEFENDANTS LACK STANDING*

212        **No evidence of Contractual Obligation**

213   Defendants claim a controversy based on a contractual violation by Petitioner but have failed to
214   produce said contract. Even if Defendants produced evidence of the existence of said contract in
215   the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence
216   that a contract actually existed at one point in time. A copy, considering the present state of
217   technology, could be easily altered. As Lender only created one original and that original was
218   left in the custody of Lender, it was imperative that Lender protect said instrument.

219   In as much as the Lender is required to present the original on demand of Petitioner, there can be
220   no presumption of regularity when the original is not so produced.   In as much as Lender has
221   refused Petitioner's request of the chain of custody of the security instrument in question by
222   refusing to identify all current and past real parties in interest, there is no way to follow said
223   chain of custody to insure, by verified testimony, that no alterations to the original provisions in
224   the contract have been made.   Therefore, the alleged copy of the original is only hearsay
225   evidence that an original document at one time existed. Petitioner maintains that, absent
226   production of admissible evidence of a contractual obligation on the part of Petitioner,
227   Defendants are without standing to invoke the subject matter jurisdiction of the court.

228        **No Proper Evidence of Agency**

229   Defendants claim agency to represent the principal in a contractual agreement involving
230   Petitioner, however, Defendants have failed to provide any evidence of said agency other than a
231   pronouncement that agency has been assigned by some person, the true identity and capacity of
232   whom has not been established. Defendants can hardly claim to be agents of a principal then
233   refuse to identify said principal. All claims of agency are made from the mouth of the agent with
234   no attempt to provide admissible evidence from the principal.

ORIGINAL PETITION                                                        8 of 25

235   Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the
236   court.

237       **Special Purpose Vehicle**

238   Since the entity now claiming agency to represent the holder of the security instrument is not the
239   original lender, Petitioner has reason to believe that the promissory note, upon consummation of
240   the contract, was converted to a security and sold into a special purpose vehicle and now resides
241   in a Real Estate Mortgage Investment Conduit (REMIC)   as defined by the Internal Revenue
242   Code and as such, cannot be removed from the REMIC as such would be a prohibited
243   transaction.    If the mortgage was part of a special purpose vehicle and was removed on
244   consideration of foreclosure, the real party in interest would necessarily be the trustee of the
245   special purpose vehicle.  Nothing in the pleadings of Defendants indicates the existence of a
246   special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
247   cause to believe defendant is not the proper agent of the real party in interest.

248   *CRIMINAL CONSPIRACY AND THEFT*

249   Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
250   a criminal conspiracy to defraud Petitioner.  Said conspiracy but are not limited to acts of
251   negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
252   acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
253   Petitioner by Lender, which were then used to fund the improper payment of commission fees to
254   Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

255   *AGENT PRACTICED UP-SELLING*

256   By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.  In so
257   doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
258   that Agent was licensed by the state.  Agent further defrauded Petitioner by failing to disclose
259   Agent's conspiratorial relationship to Lender,  Agent violated Agent's fiduciary duty to
260   Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
261   connivances, wherein Agent proactively made knowingly false and misleading statements of
262   alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
263   Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
264   a loan product offered by the Lender.  Said loan product was more expensive than Petitioner

265 could legally afford. Agent acted with full knowledge that Petitioner would have made a
266 different decision had Agent given complete disclosure.

267 *FRAUDULENT INDUCEMENT*

268 Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
269 known, Petitioner could not afford in order to unjustly enrich Lender.

270 *EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT*

271 Said more expensive loan product was calculated to produce a higher return when sold as a
272 security to an investor who was already waiting to purchase the loan as soon as it could be
273 consummated.

274 **Extra Commission for Late Payments**

275 Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
276 that Lender intended Petitioner would have difficulty paying. The industry standard payment to
277 the servicer for servicing a mortgage note is 3% of the amount collected. However, if the
278 borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
279 Thereby, the Lender stands to receive more than double the regular commission on collections if
280 the borrower pays late.

281 **Extra Income for Handling Foreclosure**

282 Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
283 on which Lender intended petitioner to default. In case of default, the Lender, acting as servicer,
284 receives considerable funds for handling and executing the foreclosure process.

285 **Credit Default Swap Gambling**

286 Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
287 default swap, commonly referred to as a derivative as addressed more fully below. Since Lender
288 designed the loan to fail, betting on said failure is essentially a sure thing.

289 *LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN*

290 Lender sold the security instrument after closing and received consideration in an amount in
291 excess of the lien held by Lender. Since Lender retained the lien document upon the sale of the

292  security instrument, Lender separated the lien from said security instrument, creating a fatal and
293  irreparable flaw.

294  When Lender received consideration while still holding the lien and said consideration was in
295  excess of the amount of the lien, Lender was in a position such that he could not be harmed and
296  could not gain standing to enforce the lien. The lien was, thereby, rendered void.

297  Since the separation of the lien from the security instrument creates such a considerable concern,
298  said separation certainly begs a question: "Why would the Lender retain the lien when selling the
299  security instrument?"

300  When you follow the money the answer is clear. The Lender will hold the lien for three years,
301  then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
302  the full amount from Lender's tax liability, thereby, receiving consideration a second time.

303  Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
304  lien to the holder of the security, however, the lien once satisfied, does not gain authority just
305  because the holder, after receiving consideration, decides to transfer it to someone else.

306  ***LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES***

307  Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
308  information that Lender had as a result of creating the faulty loans sure to default. Lender was
309  then free to invest on the bet that said loan would default and stood to receive unjust enrichment
310  a third time. This credit default swap derivative market scheme is almost totally responsible for
311  the stock market disaster we now experience as it was responsible for the stock market crash in
312  1907.

313  ***LENDER CHARGED FALSE FEES***

314  Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
315  Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
316  vendor.

317  Lender charged other fees that were a normal part of doing business and should have been
318  included in the finance charge.

319   Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time

320   did Lender or Trustee provide documentation to show that the fees herein listed were valid,

321   necessary, reasonable, and proper to charge Petitioner.

| | | |
|---|---|---|
| 803 | Appraisal Fee | $450.00 |
| 809 | Broker Origination Fee | $3,220.00 |
| 810 | Processing Fee | $500.00 |
| 811 | Misc Fees | $1,260.00 |
| 901 | Interest ) | $1,605.84 |
| 902 | Mortgage Insurance Premium | $209.33 |
| 903 | Hazard Insurance Premium | $635.00 |
| 1001 | Hazard Insurance | $158.76 |
| 1002 | Mortgage Insurance | $209.33 |
| 1004 | County Property Taxes | $874.88 |
| 1101 | Settlement fee | $490.00 |
| 1109 | Lenders coverage | $437.00 |
| 1111 | Courier/Wire Fee | $25.00 |
| 1112 | Email Doc Fee | $25.00 |
| 1113 | Misc Fees | $79.89 |
| 1201 | Recording Fee | $100.00 |
| 1207 | Misc Fees | $45.00 |

322   Debtor is unable to determine whether or not the above fees are valid in accordance with the

323   restrictions provided by the various consumer protection laws.  Therefore, please provide; a

324   complete billing from each vendor who provided the above listed services; the complete contact

325   information for each vendor who provided a billed service; clearly stipulate as to the specific

326   service performed; a showing that said service was necessary; a showing that the cost of said

327   service is reasonable; a showing of why said service is not a regular cost of doing business that

328   should rightly be included in the finance charge.

329   The above charges are hereby disputed and deemed unreasonable until such time as said charges

330   have been demonstrated to be reasonable, necessary, and in accordance with the limitations and

331   restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

332   In the event lender fails to properly document the above charges, borrower will consider same as

333   false charges.  The effect of the above amounts that borrower would pay over the life of the note

334   will be an overpayment of $199,010.61  This amount will be reduced by the amount of items

335   above when said items are fully documented.

336   ***RESPA PENALTY***

337   From a cursory examination of the records, with the few available, the apparent RESPA

338   violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In

339   Lending Statement not within limits compared to Note, Truth in Lending Statement not timely

340  presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
341  No 1st Payment Letter.

342  The closing documents included no signed and dated : Financial Privacy Act Disclosure; Equal
343  Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
344  statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
345  disclosure letter; loan discount fee disclosure; business insurance company arrangement
346  disclosure; notice of right to rescind.

347  The courts have held that the borrower does not have to show harm to claim a violation of the
348  Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,
349  in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
350  no more than two thousand, considering the large number enumerated here, it is reasonable to
351  consider that the court will assess the maximum amount for each violation.

352  Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
353  the note, borrower has calculated that, the number of violations found in a cursory examination
354  of the note, if deducted from the principal, would result in an overpayment on the part of the
355  borrower, over the life of the note, of $289,495.22.

356  If the violation penalty amounts for each of the unsupported fees listed above are included, the
357  amount by which the borrower would be defrauded is $296,292.96

358  Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
359  variance, it appears that lender intended to defraud borrower in the amount of $973,346.12

360  ***LENDER CONSPIRED WITH APPRAISER***

361  Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
362  purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
363  duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
364  inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
365  Petitioner.

366  ***LENDER CONSPIRED WITH TRUSTEE***

367  Lender conspired with the trust Agent at closing to create a condition of stress for the specific
368  purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
369  fully understand what was being signed.

370   The above referenced closing procedure was a carefully crafted connivance, designed and
371   intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
372   to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
373   did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
374   as required by various consumer protection statutes.

375   ***DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES***

376   In the manner in which Defendants have carried on their business enterprises, they have engaged
377   in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
378   (Deceptive Practices Act).

379   Such conduct comprises a pattern of business activity within the meaning of such statutes, and
380   has directly and proximately caused Petitioner to suffer economic and non-economic harm and
381   detriment in an amount to be shown according to proof at trial of this matter.

382   ***EQUITABLE TOLLING FOR TILA AND RESPA***

383   The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
384   Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

385   *Any claims for statutory and other money damages under the Truth in Lending Act (15 U.S.C. §*
386   *1601,* et. seq.) and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. seq.)
387   are subject to a one-year limitations period; however, such claims are subject to the equitable
388   tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
389   subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held
390   that given the remedial purpose of TILA, the limitations period should run from the date of
391   consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
392   circumstances, suspend the limitations period until the borrower discovers or has reasonable
393   opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
394   *v. California, 784 F.2d 910, 915 9t*h Cir. 1986).

395   Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
396   anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
397   that such limitations period may be equitably tolled. The Court of Appeals for the District of
398   Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*

399   *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
400   opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
401   *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
402   that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
403   *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
404   *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
405   interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
406   language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
407   of precedential value, this Court has previously found both the TILA and **RESPA** limitations
408   periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
409   *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

410   The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
411   by the Petitioner," and inquires whether "a reasonable Petitioner would ... have known of the
412   existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*
413   *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*
414   Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on
415   any wrongful conduct by the Defendants. Santa Maria. at 1178.

416   ### *BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING*
417   ### *STANDARDS*

418   Traditionally, Lenders required borrowers seeking mortgage loans to document their income and
419   assets by, for example, providing W-2 statements, tax returns, bank statements, documents
420   evidencing title, employment information, and other information and documentation that could
421   be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's
422   ability to repay a particular loan over both the short and long term. Defendants deviated from and
423   disregarded these standards, particularly with regard to its riskier and more profitable loan
424   products.

425   **Low-Documentation/No-Documentation Loans.**

426   Driven by its desire for market share and a perceived need to maintain competitiveness with the
427   likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no
428   documentation loan products, including the HARMs and HELOCs described hereinabove, and
429   began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to

430   the already eased underwriting standards to the point of disregarding such standards. This
431   quickened the loan origination process, allowing for the generation of more and more loans
432   which could then be resold and/or securitized in the secondary market.

433   Defendants marketed no-documentation/low-documentation loan programs that included
434   HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated
435   income" or "stated assets" (SISA) neither of which were verified. Employment was verbally
436   confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,
437   was to be roughly consistent with incomes in the types of jobs in which the borrower was
438   employed. When borrowers were requested to document their income, they were able to do so
439   through information that was less reliable than in a full-documentation loan.

440   For stated income loans, it became standard practice for loan processors, loan officers and
441   underwriters to rely on www.salary.com to see if a stated income was reasonable.  Such stated
442   income loans, emphasizing loan origination from a profitability standpoint at the expense of
443   determining the ability of the borrower to repay the loan from an underwriting standpoint,
444   encouraged the overstating and/or fabrication of income.

445   **Easing of Underwriting Standards**

446   In order to produce more loans that could be resold in the secondary mortgage market,
447   Defendants also relaxed, and often disregarded, traditional underwriting standards used to
448   separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
449   the base FICO score needed for a SISA loan.

450   Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
451   used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
452   loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
453   income ratios (the amount of monthly income compared to monthly debt service payments and
454   other monthly payment obligations.

455   With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
456   term financial circumstances, approving the loan based on the initial fixed rate without taking
457   into account whether the borrower could afford the substantially higher payment that would
458   inevitably be required during the remaining term of the loan.

459   With respect to HELOCs, Defendants underwrote and approved such loans based only on the
460   borrower's ability to afford the interest-only payment during the initial draw period of the loan,
461   rather than on the borrower's ability to afford the subsequent, fully amortized principal and
462   interest payments.

463   As Defendants pushed to expand market share, they eased other basic underwriting standards.
464   For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
465   allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
466   eased underwriting standards the Defendants also were encouraging consumers to go further into
467   debt in order to supply the very lucrative aftermarket of mortgage backed securities. The relaxed
468   underwriting standards created the aftermarket supply they needed. As a result, the Defendants
469   made it easy for the unwary consumer to take on more debt than he could afford by encouraging
470   unsound financial practices, all the while knowing defaults would occur more and more
471   frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
472   standards.

473   Defendants knew, or in the exercise of reasonable care should have known, from its own
474   underwriting guidelines industry standards that it was accumulating and selling/reselling risky
475   loans that were likely to end up in default. However, as the pressure mounted to increase market
476   share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
477   underwriting guidelines. Such was the environment that loan officers and underwriters were,
478   from time to time, placed in the position of having to justify why they did not approve a loan that
479   failed to meet underwriting criteria.

480   ***Risk Layering***

481   Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
482   loans with one or more relaxed underwriting standards.

483   *Defendants knew, or in the exercise of reasonable care should have known, that layered risk*
484   would increase the likelihood of default. Among the risk layering Defendants engaged in were
485   approving HARM loans with little to no down payment, little to no documentation, and high
486   DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
487   the loans it promoted to borrowers.

488   Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
489   mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
490   believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
491   business ignored basic established underwriting standards and acted to mislead the borrower, all
492   to the detriment of the borrower and the consumer of loan products..

493   Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
494   engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
495   business practices described above in paragraphs 30-42 of this Complaint

496   ***UNJUST ENRICHMENT***

497   Petitioner is informed and believes that each and all of the Defendants received a benefit at
498   Petitioner's expense, including but not limited to the following: To the Agent, commissions,
499   yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
500   be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
501   surcharges and other "back end" payments in amounts to be proved at trial; To the investors,
502   resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
503   percentages of payment proceeds, charges, and other "back end" payments in amounts to be
504   proved at trial; To all participants, the expectation of future revenues from charges, penalties and
505   fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

506   By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
507   and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
508   deprived, and is entitled to restitution in the amount of $973,346.12

509   ***CLAIM TO QUIET TITLE.***

510   Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
511   the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
512   interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
513   and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

514   Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
515   power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
516   interest in the Subject Property has been rendered void and that the Defendants are not the holder

ORIGINAL PETITION                                                      18 of 25

517    in due course of the Promissory Note. Moreover, because Petitioner properly pled all Defendants'

518    involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-conspirators,

519        "a Petitioner is entitled to damages from those Defendants who concur in the tortuous

520        scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*

521        *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*

522        *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*

523        *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*

524        *Rptr. 2d 752 (2d Dist. 1995).*

525    ### *SUFFICIENCY OF PLEADING*

526    Petitioner has sufficiently pled that relief can be granted on each and every one of the

527    Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond

528    doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would

529    entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All

530    allegations of material fact in the complaint are taken as true and construed in the light most

531    favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

532    Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.

533    8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal

534    theories, and seeks remedies to which Petitioner is entitled. *Balistreri v. Pacifica Police Dept., 901 F.2d*

535    *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal

536    conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court

537    should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,

538    Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of

539    their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore,

540    relief as requested herein should be granted.

541    ## CAUSES OF ACTION

542    ### *BREACH OF FIDUCIARY DUTY*

543    Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary

544    duty of care with respect to the mortgage loan transactions and related title activities involving

545    the Trust Property.

546   Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
547   breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
548   all applicable laws governing the loan transactions in which they were involved, including but
549   not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

550   Defendant's breaches of said duties were a direct and proximate cause of economic and non-
551   economic harm and detriment to Petitioner(s).

552   Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
553   all to be shown according to proof at trial of this matter.

554   *CAUSE OF ACTION - NEGLIGENCE/NEGLIGENCE PER SE*

555   Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
556   duty to properly perform due diligence as to the loans and related transactional issues described
557   hereinabove.

558   In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
559   X and Z promulgated there under to, among other things, provide proper disclosures concerning
560   the terms and conditions of the loans they marketed, to refrain from *marketing loans they knew*
561   or should have known that borrowers could not afford or maintain, and to avoid paying undue
562   compensation such as "yield spread premiums" to mortgage Agents and loan officers.

563   Defendants knew or in the exercise of reasonable care should have known, that the loan
564   transactions involving Petitioner and other persons similarly situated were defective, unlawful,
565   violative of federal and state laws and regulations, and would subject Petitioner to economic and
566   non-economic harm and other detriment.

567   Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
568   Z promulgated there under were intended and designed to protect, and the conduct alleged
569   against Defendants is the type of conduct and harm which the referenced statutes and regulations
570   were designed to deter.

571   As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
572   non-economic harm in an amount to be shown according to proof at trial.

573    ***AGENT: COMMON LAW FRAUD***

574    If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
575    negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
576    ground for believing them to be true.

577    Agents made these representations with the intention of inducing Petitioner to act in reliance on
578    these representations in the manner hereafter alleged, or with the expectation that Petitioner
579    would so act.

580    Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
581    in their negligent misrepresentation, and that various Agents were negligent in not implementing
582    procedures such as underwriting standards oversight that would have prevented various Agents
583    from facilitating the irresponsible and wrongful misrepresentations of various Agents to
584    Defendants.

585    Petitioner is informed and believes that Agent acted in concert and collusion with others named
586    herein in promulgating false representations to cause Petitioner to enter into the LOAN without
587    knowledge or understanding of the terms thereof.

588    As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
589    Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
590    opportunities, attorney fees and costs, and other damages to be determined at trial. As a
591    proximate result of Agents' breach of duty and all other actions as alleged herein, Plaintiff has
592    suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
593    mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
594    at trial.

595    ***PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED***
596    ***COVENANT OF GOOD FAITH AND FAIR DEALING.***

597    Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
598    fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
599    performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
600    *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*

601   *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
602   *Jones, (2004) 33 Cal. 4th 917,* the court stated:

603   In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
604   particular significance, in part because of the special relationship between the insurer and the
605   insured. The insurer, when determining whether to settle a claim, must give at least as much
606   consideration to the welfare of its insured as it gives to its own interests. . . The standard is
607   premised on the insurer's obligation to protect the insured's interests . . . *Id. at 937.*

608   Likewise, there is a special relationship between an Agent and borrower. "A person who
609   provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
610   otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
611   consumer...this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
612   be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
613   *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
614   *defaulting ... they have a fiduciary duty to the borrower not* to place them in that loan."
615   (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).
616   [*Emphasis Added*].

617   All Defendants, willfully breached their implied covenant of good faith and fair dealing with
618   Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to
619   provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan
620   product without regard for other more affordable products; (4) Placed Petitioner into a loan
621   without following proper underwriting standards; (5) Failed to disclose to Petitioner that
622   Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform
623   valid and /or properly documented substitutions and assignments so that Petitioner could
624   ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's
625   request for documentation of the servicing of Petitioner's loan and the existence and content of
626   relevant documents. Additionally, Defendants breached their implied covenant of good faith and
627   fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the
628   right under an alleged power of sale because the purported assignment was not recorded and by
629   willfully and knowingly financially profiting from their malfeasance. Therefore, due to the
630   special relationship inherent in a real estate transaction between Agent and borrower, *and* all
631   Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

632   *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET*
633   *SEQ*

634   Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation
635   contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of
636   Action as though the same were set forth herein.

637   Petitioner is informed and believes that Defendant's violation of the *provisions of law rendered*
638   the credit transaction null and void, invalidates Defendant's claimed interest in the Subject
639   Property, and entitles Petitioner to damages as proven at trial.

640   *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

641   The conduct committed by Defendants, driven as it was by profit at the expense of increasingly
642   highly leveraged and vulnerable consumers who placed their faith and trust in the superior
643   knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by
644   civilized society.

645   Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
646   distress, or acted in conscious and/or reckless disregard of the probability that such distress
647   would occur.

648   Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
649   conduct of Defendants as described hereinabove.

650   As a result of such severe emotional distress, Petitioner suffered economic and non economic
651   harm and detriment, all to be shown according to proof at trial of this matter.

652   Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
653   Petitioner and secure to Petitioner quite title;

654   Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
655   as payments to Defendants based on the fraudulently secured promissory note in an amount to be
656   calculated by Defendants and verified to Petitioner;

657   Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
658   amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
659   equal to $2,920,038.36

ORIGINAL PETITION                                                    23 of 25

660                                    **PRAYER**

661     WHEREFORE, Petitioner prays for judgment against the named Defendants, and each of them,

662     as follows:

663            For an emergency restraining order enjoining lender and any successor in interest from

664            foreclosing on Petitioner's Property pending adjudication of Petitioner's claims set forth

665            herein;

666            For a permanent injunction enjoining Defendants from engaging in the fraudulent,

667            deceptive, predatory and negligent acts and practices alleged herein;

668            For quiet title to Property;

669            For rescission of the loan contract and restitution by Defendants to Petitioner according

670            to proof at trial;

671            For disgorgement of all amounts wrongfully acquired by Defendants according to proof

672            at trial;

673            For actual monetary damages in the amount $973,346.12;

674            For pain and suffering due to extreme mental anguish in an amount to be determined at

675            trial.

676            For pre-judgment and post-judgment interest according to proof at trial;

677            For punitive damages according to proof at trial in an amount equal to $2,920,038.36.

678            For attorney's fees and costs as provided by statute; and,

679            For such other relief as the Court deems just and proper.

680     **Respectfully Submitted,**
681
682            _____          _____
683            **Ursula** Schanne                    Gerard H Moore
684
685
686
687
688
689
690
691
692
693
694

695  **Ursula Schanne**, *pro se*
696  **Gerard H Moore**, *pro se*
697  16503 Reichel Rd SE
698  Rainier, Washington 98576
699  (360) 446-2121
700  xercies@aol.com
701

FILED
LODGED
RECEIVED
OCT 14 2010
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
DEPUTY

702      UNITED STATES DISTRICT COURT FOR THE

703      WESTERN DISTRICT OF WASHINGTON STATE

704

**Ursula Schanne**, *pro se*
**Gerard H Moore**, *pro se*

Plaintiff,

vs.

**Nationstar Mortgage LLC**

Defendant

Case # _____

**ORIGINAL PETITION**

Date: October 14th 2010

705
706
707          <u>PLAINTIFF'S DEMAND FOR JURY TRIAL</u>

708

709  Plaintiff, Ursula Schanne  Gerard H Moore  asserts his rights under the Seventh

710  Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil

711  Procedure 38, a trial by jury on all issues.

712  **Respectfully Submitted,**
713
714      _____        _____
715          **Ursula** Schanne                    Gerard H Moore
716